IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ROY R. YEOMAN III, nanoDERM SCIENCES, INC.

Plaintiff,

V.

XIAOYANG XU,
NEW JERSEY INSTITUTE OF TECHNOLOGY,
LEI WANG,
XIN LI,
TIANYU SUN,
YUNG-HAO TSOU
WILLIAM HO
HELEN (XUEQING) ZHANG
INSTITUTE FOR LIFE SCIENCE ENTREPRENEURSHIP, INC.
KEITH A. BOSTIAN
LYNN L. SILVER
MOHAMED EL-SHERBEINI

-and-

PROKARYOTICS, INC.

Defendants.

Case No. ____________

**TRIAL BY JURY IS DEMANDED**

# COMPLAINT

Plaintiff, NanoDERM Sciences, Inc. ("nDS"), by counsel, pursuant to Rule 3 of the Federal Rules of Civil Procedur e (the "Rules"), files this Complaint against Defendants, Xiaoyang Xu ("Xu"), the New Jersey Institute of Technology ("NJIT"), QueQing Zhang ("Zhang"), Lei Wang ("Wang"), Xin Li ("Li"), Tianyu Sun ("Sun"), Yung-Hao Tsou ("Tsou"), William Ho ("Ho"), Institute for Life Science Entrepreneurship, Inc. ("ILSE"),

Keith A. Bostian ("Bostian"), Lynn L. Silver ("Silver"), Mohamed El-Sherbeini ("El-Sherbeini"), and Prokaryotics, Inc. ("Prokaryotics"), jointly and severally.

Plaintiff seeks (a) compensatory damages, statutory damages (double the damages sustained) and punitive damages in the sum of **$300,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury, (c) reasonable attorneys' fees in a sum to be determined by the Court pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure, and (d) court costs – arising out of Defendants' violations of the Defend Trade Secrets Act, Title 18 U.S.C. § 1832 *et seq*., violations of the Uniform Trade Secrets Act, N.J. Stat. § 56:15-1 *et seq*., conversion, conspiracy, tortious interference with contract, breach of fiduciary duty, breach of contract, and unjust enrichment.

Plaintiff also requests a permanent injunction barring the Defendants from using Plaintiffs' trade secrets and intellectual property and ordering the complete disgorgement of all revenue obtained by the Defendants from the use of Plaintiffs' property.

## I. INTRODUCTION

1. nDS is a company at the forefront of the multi-billion dollar market for targeted nanotechnology medicine. nDS invented a new bio-compatible, co-polymer molecule – HydroDEX™ – for targeted drug delivery. Successful research and development, funded by grant awards from the Department of Homeland Security ("DHS") and the Department of Defense ("DoD"), produced "Proof of Concept" data that nDS's patented HydroDEX™ antibacterial nanogels safely target and destroy all of the Center for Disease Control and Prevention's ("CDC") priority multi-drug resistant bacterial ("MRB") pathogens. These bad bugs take a staggering toll in lost lives world-wide and cost the United States health care system, alone, over $25 billion annually. In 2013, the CDC

published the first AR Threats Report, which sounded the alarm to the danger of antibiotic resistance. The report stated that each year in the U.S. at least 2 million people get an antibiotic-resistant infection, and at least 23,000 people die. The 2013 AR Threats Report helped inform the United States National Action Plan for Combating Anti-biotic Resistant Bacteria. [https://www.cdc.gov/drugresistance/us-activities/national-action-plan.html]. The CDC recently released its updated (2019) "Biggest Threats and Data" report [ https://www.cdc.gov/drugresistance/biggest-threats.html] indicating that antibiotic-resistant bacteria and fungi cause more than 2.8 million infections and 35,000 deaths in the United States each year. The 2013 and 2019 CDC reports do not include viruses (e.g., HIV, influenza, COVID-19) or parasites. [https://www.cdc.gov/drugresistance/pdf/threats-report/2019-ar-threats-report-508.pdf]. The problem of drug resistant bacteria is also rampant in Germany and throughout Europe, and is even worse in the People's Republic of China ("PRC").

2. nDS brings this action after discovering that the Defendants misappropriated nDS's advanced nanotechnology, pirated the company's proprietary R&D project funded by the DoD Defense Health Program (DHP) Small Business Innovation Research (SBIR) Award, and profited from Plaintiff's trade secrets.

3. In this action, nDS seeks money damages and injunctive relief as a result of the Defendants' misappropriation of trade secrets and other wrongdoing.

## II. PARTIES

4. nDS is a corporation organized, existing and in good standing under the laws of Maryland. It was founded in 2010. Its principal place of business is Derwood, Maryland. nDS's founder, sole shareholder, President and CEO is Roy R. Yeoman, III

("Yeoman"). Yeoman has over 30 years of experience in the biochemical, medical device, and medical research industries. He founded, operated, and managed product design, research and development ("R&D"), sales and commercialization for multiple companies, including Automated Diagnostic Systems, Inc., Micron Environmental Systems, Inc., and nDS. nDS is a therapeutic products developer and ILSE member. At all times relevant to this action, nDS had laboratories under contract in Union, New Jersey. Yeoman led the nDS R&D team, which was dedicated to the discovery, research, development, and commercialization of innovative drug delivery, advanced wound healing, and infectious disease therapy products. nDs's mission was to identify large health care markets of high priority unmet needs and to develop safe, effective, life-saving therapy for patients worldwide. nDS has obtained multiple U.S. and European patents. On October 20, 2015, nDS obtained a patent (US Patent No. 9,161,962 B2) – "**Targeted Therapeutic Nanoparticles**" – for a revolutionary nanotechnology platform for drug delivery and targeted therapeutic medicine. On July 4, 2017, nDS obtained a follow-on patent (US Patent No. 9,694,085 B2) for its methods and compositions related to chemical conjugations to nanoparticles of polysaccharides cross-linked to poloxamers as well as nano-sized colloids comprised of polysaccharides and poloxamers. Until its trade secrets were misappropriated by the Defendants, the focus of nDS's R&D plan was to protect, expand, and develop its patented drug delivery platform for large commercial markets with high priority medical needs. [http://www.nanodermsciences.com/].

5. Defendant, Xu, is a citizen of New Jersey. He is an associate professor of chemical and materials engineering at the New Jersey Institute of Technology ("NJIT"). [https://chemicaleng.njit.edu/faculty/xiaoyang]. He is Director of the Laboratory of

Nanomedicine and Healthcare materials at NJIT (the "Xu Lab"). He received his Ph.D in chemistry from Northwestern University, and completed his joint NTH postdoctoral training at the Massachusetts Tnstitute of Technology ("MIT") and Harvard Medical School. His research focus is the development of novel biomaterials and nanotechnologies for medical applications, including diagnosis, bioimaging, drug delivery and regenerative medicine. At all times relevant to this action, Xu served as a consultant to nDS. Xu signed a written contract dated January 25, 2016 pursuant to which he was provided confidential information (trade secrets) about nDS's technology. Xu acknowledged and agreed that all of his work-product as a consultant belonged to and was the property of nDS. Xu had no grant awards when nDS hired him as a private consultant in 2016. He has since won a number of awards and grants (New Jersey Health Foundation, National Science Foundation, NTH-NCT) based upon the misappropriation of nDS's trade secrets and data derived from work for nDS on the Department of Defense DHP SBTR Phase T contract (described below). [*See* http://centers.njit.edu/nhblab/news-1/].

6. Defendants, Wang, Li, Sun, Tsou and Ho, were or are Ph.D. or Masters students who worked/work for Xu in the Xu Lab. [http://centers.njit.edu/nhblab/people/]. Upon information and belief, Wang, Li, Sun, Tsou and Ho are citizens of the PRC. At all times relevant to this action, Wang, Li, Sun, Tsou and Ho combined, associated and conspired with Xu and others to disclose and misappropriate nDS's trade secrets. For instance, Wang, Li, Sun, and Tsou are co-authors with Xu and Soochow University (China) Professor Hong Chen ("Chen") of a paper published on September 30, 2017 in the journal of macromolecular bioscience (www.mbs-journal.de entitled ): **Dual-Functional**

**Dextran-PEG Hydrogel as an Antimicrobial Biomedical Material**" [http://centers.njit.edu/nhblab/sites/nhblab/files/download32.pdf].

7. Defendant, NJIT, is a public polytechnic university in New Jersey. [https://www.njit.edu/about]. At all times relevant to this action, NJIT and its agents and employees, including Wang, Li, Sun, Tsou and Ho, aided and abetted Xu's unlawful activity, and received the ill-gotten gains of the trade secret misappropriation.

8. Defendant, Zhang, is a citizen of Massachusetts. She is married to Xu. Zhang graduated from Wuhan University in 1999 with a degree in applied chemistry. In 2005, she obtained a Ph.D from Wuhan University in polymer chemistry and physics. Between 2010 and the present, Zhang has been a post-doctoral fellow at the Harvard Medical School, where she has focused, *inter alia*, on the design, synthesis, characterization and evaluation of novel pH-responsive hydrogels for oral insulin delivery, and the development and pharmaceutical optimization of nano-sized amphiphilic block copolymer micelles for targeted delivery of siRNA, chemotherapeutics, and anti-inflammatory therapeutics to the organs or tissues of interest. In the course of her work, Zhang has synthesized and characterized novel biodegradable polymers; designed and conducted experiments to investigate drug or siRNA-loaded nanoformulations for their physicochemical properties, targeting capacity, and biocompatibility; and established models to explore the optimal polymeric carriers for their pharmacokinetics, biodistribution, and therapeutic efficacy. [https://www.linkedin.com/in/xueqing-zhang-b2073431/]. Zhang is a prolific scientific writer associated with the Engineering Research Center of Cell & Therapeutic Antibody, Ministry of Education, School of Pharmacy, Shanghai Jiao Tong University, Shanghai, PRC. She has co-authored a number of

published papers with her husband, Xu, disclosing and misappropriating nDS's confidential information and trade secrets.

9. Defendant, ILSE, is New Jersey corporation with its principal place of business in Union, New Jersey. [https://ilsebio.com/]. ILSE is an integrated research facility and network that focuses on life sciences innovation in medicine, devices and other technologies. ILSE identifies and attracts scientific innovators, entrepreneurs, investors and business leaders and bring them together. ILSE works in partnership with affiliated academic and biomedical institutions to accelerate and extend progression of their early innovations into high-value assets for third-party licensing and commercialization. nDS engaged ILSE for Biological Safety Level ("BSL") 2 microbiology evaluation and antibacterial activity of nDS's antibacterial nanogels against multidrug resistant bacteria.

10. Defendant, Bostian, is a citizen of New Jersey. He is CEO of ILSE. He is Dean of the New Jersey Center for Science, Technology & Mathematics and Technology Transfer at Kean University. He earned his doctorate in Biochemistry from the University of London. Bostian has held senior executive positions in numerous corporations. At Merck, he was Head of Microbiology and Molecular Genetics, with responsibility for antimicrobial drug discovery as well as discovery of new leads from natural products for all of Merck's worldwide drug discovery programs. https://ilsebio.com/leadership/keith-bostian-phd/].

11. Defendant, Silver, is a citizen of New Jersey. Silver is the owner of the independent consultancy, LL Silver Consulting, LLC in Springfield, New Jersey, where she advises the pharmaceutical industry on antibacterial discovery and preclinical development. [https://www.linkedin.com/in/lynnsilver/]. Silver is an expert in antibacterial agents, screen design and execution, microbiological evaluation of hits and

leads, and studies of mechanism of action and resistance. She set up her consultancy business in 2004, after taking early retirement following 21 years at Merck Research Laboratories. Silver has participated in the discovery of the novel antibiotic platensimycin and the first published inhibitors of LpxC. At all times relevant to this action, Silver was subject to a non-disclosure and non-circumvention agreement with nDS.

12. Defendant, El-Sherbeini, is a citizen of New Jersey. El-Sherbeini graduated from Masoura University, Egypt, with M.Sc. and B.Sc. degrees in microbiology. He obtained a Ph.D in molecular genetics from the University of London and a masters in molecular biology from Brown University. He was a research fellow at Merck. He is an adjunct professor of biologic sciences and bio-therapeutics at Kean University. At all times relevant to this action, El-Sherbeini acted as nDS's Director of Microbiology. El-Sherbeini established an nDS microbiology BSL2 laboratory and managed the nDS microbiology incubator lab at ILSE/Kean University, where he conducted all of the microbiology experiments and evaluations for the DHP SBIR Phase I award program.

13. Defendant, Prokaryotics, is a New Jersey corporation, with headquarters in Union, New Jersey. [http://prokaryotics.com/]Prokaryotics claims to be an "authentic antibacterial discovery organization committed to bringing forth innovative therapeutics to address the problem of multidrug resistant bacteria and combating the emerging global crisis of antibiotic resistance." On its website, Prokaryotics represents that "[w]e are a start-up company resulting from the licensing of several novel antibiotic programs from Merck & Co., Inc. – by a team of former senior scientists at the company including the head of the Antimicrobial Early Discovery Unit, to optimize a number of Merck's early-stage programs. Prokaryotics has negotiated worldwide rights to develop, manufacture and

commercialize pre-clinical assets and programs targeting both Gram-negative and Gram-positive bacteria." Bostian is the CEO and a board member of Prokaryotics. Silver is a member of Prokaryotics' scientific advisory board. [http://prokaryotics.com/our-team/management/scientific-advisory-board/].

## III. JURISDICTION AND VENUE

14. The United States District Court for the District of New Jersey has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1332 (Diversity Jurisdiction), and 28 U.S.C. § 1367 (Supplemental Jurisdiction). The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15. The Defendants are subject to both general and specific personal jurisdiction in New Jersey. The Defendants are at home in New Jersey. They engage in continuous and systematic business in New Jersey. They purposefully availed themselves of the privileges of conducting business in NewJersey. Plaintiff's claims arise out of Defendants' business activities in New Jersey and misappropriation of trade secrets and other wrongful acts that occurred in New Jersey. Defendants have minimum contacts with New Jersey such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

16. Venue is proper in the United States District Court for the District of New Jersey pursuant to Title 28 U.S.C. § 1391(b)(1) and (b)(2). All the Defendants reside in New Jersey. A substantial part of the events or omissions giving rise to the claims stated in tis action occurred in New Jersey.

## IV. STATEMENT OF MATERIAL FACTS

17. The use of antibiotics in the treatment of infectious disease has increased greatly over the past fifty-plus years. Due to the ubiquitous use, bacteria have developed resistance to antibiotics commonly administered to treat bacterial infections. Antimicrobial resistance has been reported for all known antibacterial drugs currently available. The global market for infectious disease diagnostic, vaccine, and treatment products reached $126.2 Billion in 2016 and should reach $183.2 Billion in 2021. According to the CDC, more than 2,000,000 people each year get hospital-acquired infections ("HAI") of which almost 100,000 die. Estimated costs associated with HAI in the United States are as high as $30 Billion annually. HAI and other infections are most often caused by gram-negative bacteria ("GNB"), but can also occur from other bacteria, viruses, fungi and parasites.[1]

[1] Gram negative bacterial pathogens constitute the most ubiquitous and serious sources of infection in civilian and military populations. GNB have an outer membrane that protects them from antibiotics and detergents. The lipopolysaccharides ("LPS") of GNB function to provide membrane stabilization, integrity and confer resistance to host defenses. LPS is critical to the proliferation of gram-negative bacteria. Disruption, mutation or removal of LPS results in bacterial death. All gram negative bacteria exhibit LPS in their outer membrane. LPS is composed of complex carbohydrates and lipid A. The carbohydrates vary in structure and confer the antigenic properties which distinguish different bacterial strains. The lipid A is highly conserved across strains and is responsible for many of the pathogenic, immunologic and pyrogenic effects of GNB. The ubiquitous nature of LPS makes it an attractive target for treatment of nearly all GNB strains. Lipid A is a critical structural component of LPS. It functions to anchor LPS to the cell membrane and it is structurally bound to the core polysaccharide. The synthesis of the KDO lipid A complex is under control of a series of several constitutively expressed enzymes. Not all bacteria possess all of the enzymes, but certain enzymes are commonly expressed in GNB. nDS identified several sequences in the LpxC gene from both E. coli and P. aeruginosa, and constructed short inhibitory RNAs ("siRNAs") from these sequences to target and disrupt LPS.

18. The annual cost of antibiotic-resistant infections in the U.S. healthcare system has been calculated to be in excess of $20 billion.[2]

19. The widespread use of antibiotics, especially broad-spectrum antibiotics is believed to have played a significant role in the emergence of drug resistant bacteria ("DRB"). For obvious national security reasons, the United States Government, including the military, is extremely concerned about the rise of DRB. [3] This deadly health care problem is widespread in Europe and much worse in the PRC. Indeed, widespread E-coli bacteria have been found in China that cannot be killed with Colistin (Polymyxin E) the antibiotic drug of last resort.[4] The bacterial pathogen samples were taken from farm pigs, meat products, and a number of patients throughout China. Farmers in China have been using Polymyxin by the tons in animals, where low doses of antibiotics can promote growth of DRB. On November 18, 2015, Chinese scientists published in the British medical journal *The Lancet* that a single, easily spreadable gene called *mcr-I* makes the bacteria that carry it resistant to colistin. The alarming feature of *mcr-I* is that the gene moves easily from bug to bug and also from a family like E. coli to others, like Klebsiella

[2] https://www.cdc.gov/drugresistance/threat-report-2013/pdf/ar-threats-2013-508.pdf; https://www.cdc.gov/drugresistance/pdf/threats-report/2019-ar-threats-report-508.pdf.

[3] In fact, under the Defense Health Program ("DHP") 15.1 Small Business Innovation Research ("SBIR") Program, discussed further below, the United States Army awarded nDS a DHP/SBIR Phase I contract for 15.1 topic: "*Small Molecule to Combat Multidrug-Resistant Bacteria*"

[4] Ref: Liu YY, Wang Y, Walsh TR, et al. Emergence of plasmid-mediated colistin resistance mechanism MCR-1 in animals and human beings in China: a microbiological and molecular biological study. Lancet Infect Dis. 2016;16:161-168. https://mbio.asm.org/content/7/4/e01191-16.

pneumoniae. Researchers working at Walter Reed Institute of Research have found *mer-1 E. eoli* in a bacteria cultured from a Pennsylvanian who sought treatment for a urinary tract infection. This is the first confirmed appearance of the colistin-resistant strain of the bacteria in a human in the United States. The Department of Health and Human Services (HHS) said in a statement that strains have since been found in Europe and Canada, and in a sample taken from a pig intestine in the US.

20. An important goal for the nDS R&D program, therefore, was the development of an effective biocompatible drug delivery system that would "target" susceptible microorganisms, rather than a systemic delivery to the entire body. This delivery system would allow for lower levels of the agents, reduce the exposure to beneficial organisms and minimize the development of drug-resistant strains of pathogens. The concept of a "magic bullet" delivery system has been sought after, but few strategies have proven successful. Drug activity is a result of molecular interactions in certain cells. The drug must reach the cellular site of action at sufficient concentration following, oral, intravenous, local, transdermal, or other means of administration. The aim of targeted drug delivery is to deliver the drug at the specific site of action, at the right concentration, and for the effective period of time. This was nDS's and Yeoman's goal from the beginning. This vision and ingenuity resulted in the creation of nDS's novel targeting therapeutic HydroDEX™ nanogel drug delivery system.

21. HydroDEX™ is a new and patented copolymer molecule that when conjugated with an antibiotic or a combination of antibiotics, such as the company proprietary dual antibacterial conjugates Polymyxin and Vancomycin ("Vanco"), improves the effectiveness of antibacterial activity as these HydroDEX™ covalently "bound"

antibiotics actively destroy bacterial cell walls and safely biodegrade as biocompatible and bioabsorbable material. In short, the HydroDEX™ nanogels are made from low-cost FDA approved constituents and carry the potential to deliver potent drugs directly to the infected site, thus maximizing the effects of the drug, while minimizing the side effects to the patient. nDS tested the efficacy of HydroDEX™ antibacterial nanogels against ***both*** multi-drug resistant ("MDR") GNB ***and*** gram positive bacteria ("GPB"). The confidential results show: (1) GNB-targeting HydroDEX™ antibacterial nanogels and GPB-targeting HydroDEX™ antibacterial nanogels selectively target and kill MDR GNB and GPB, respectively; and (2) conjugations of these antibiotics to the HydroDEX™ drug delivery nanogels greatly ***increases efficacy and antibiotic's activity*** relative to the free drug. Once attached to the GNB cell wall or the GPB membrane, the HydroDEX™ antibiotic targeting agents punch holes in the bacterial pathogens resulting in cell death and the loss of reproductive contents.[5] The following slide depicts how HydroDEX™ works to target and attack GNB and GPB:

---

[5] nDS raised $50,000 (private inves tment fund) to develop the "gram positive" bacterial targeting HydroDEX™ nanogels with an "active" GPB antibacterial warhead. The nDS select Vancomycin drug conjugated to the H ydroDEX™ nanocarrier was successful in safely killing MDR resistant GPB pathogens, *e g , MRSA* (methicillin-resistant S. aureus – a CDC "high priority" pathogen). This confidential nDS work was performed under pursuant to strict non-disclosure non-circumvention agreements at the RTI incubator Lab on the University of Maryland, College Park campus. nDS capital supported the successful development of a company proprietary HydroDEX™ antibacterial nanogel to combat infections caused by MDR GPB and the milestone *Proof of Concept* data of HydroDEX™ antibacterial activity against MDR GPB (including MRSA). This valuable company proprietary HydroDEX™ antibacterial *Proof of Concept* data is a nDS "trade secret" that enabled nDS to win the U.S. DOD, Defense Health Program (DHP) 15.1 SBIR Phase I contract for DHP topic 15-007: "*Small Molecule to Combat Multidrug-Resistant Bacteria*." With this valuable confidential addition to the nDS antibacterial R&D program, nDS created HydroDEX™ "Gram Positive" targeted Antibacterial nanogels with "active" Vancomycin antibacterial warheads that produced antibacterial activity against MDR GPB.




nDS's confidential information, methods, and procedures for creating its HydroDEX™ antibacterial nanogels are not generally known to the public, nor are they readily ascertainable. nDS has taken numerous steps to safeguard and limit access to such information, including by patents, trademarks, non-disclosure and non-circumvention agreements, and by other contracts. nDS's confidential information provides nDS with a significant advantage over competitors who do not know or use the information.

22. nDS's HydroDEX™ nanogels produced under a proprietary emulsion polymerization method have broad commercial opportunity, including applications for infectious disease targeted nanomedicine worldwide. HydroDEX™ was the result of the continuing efforts of nDS to develop a high capacity, non-toxic, biocompatible, thermal-responsive, and biodegradable hydrogel. HydroDEX™ serves as a safe, universal standard

in controlled nanoparticle drug delivery. Combined markets in need of the nDS drug delivery device, with tunable, "controlled-release" and "degradation" drug delivery features are in excess of $250 Billion.

23. nDS's initial commercialization strategy focused on the development of HydroDEX™ for bacterial targeting/therapy to control MRB pathogens. As nDS's principal investigator ("PI"), Yeoman won the 2013 Joint Technology Transfer Initiative (JTTI) Grant Award for "*Prevention of Multiple Drug Resistant Pathogen Infection in Burn Wounds*"from the Maryland Economic Developmen t Corporation ("TEDCO"). Yeoman was also program director ("PD") for the nDS Cooperative Research and Development Agreement (CRADA) with the U.S. Army Walter Reed Institute of Research (WRAIR) to evaluate the nDS targeted antibacterial nanogels. Based on the need to control infections by MRB globally, in particular within high risk patient populations in the United States military, nDS won a 2015 DHP/SBIR Phase I feasibility contract that delivered a working antibacterial prototype to combat infections caused by DRB pathogens. An nDS 5-year DHP contract has successfully delivered HydroDEX™ Proof of Concept Data for *in vitro* antibacterial activity against MDR bacteria. With its patented technology, nDS's vision was to become the market leader in the $100 billion infectious disease, and license its intellectual property to the rapidly growing targeted drug delivery market. nDS's focus was to produce antibacterial nanomedicine to combat burn wound sepsis, the most common and serious complication of major burn injury, accounting for over sixty percent (60%) of deaths in burn patients today. Sepsis (which affects about 750,000 US patients each year, killing one person every 2.5 minutes) is mostly caused by "bacterial infections" which can be treated with nDS's patented therapy.

## A. ***THE MISAPPROPRIATION OF nDS'S INTELLECTUAL PROPERTY***

### 1. ***ILSE, Bostian, Silver and El-Sherbeini***

24. The key to "targeted" HydroDEX™ nanomedicine, whether it be as an infectious disease therapy, cancer therapy, etc., is the conjugations to the HydroDEX™ copolymer molecule that specifically attach to the pathogen, *i.e.*, Polymyxin B ("PMB") to target GNB and Vanco to target GPB (e.g. MRSA). Both select drug conjugates (PMB and Vanco) were out of patent protection when nDS conjugated them to HydroDEX™ to invent the nDS method of targeted antibacterial drug delivery. When conjugated to the HydroDEX™ nanocarrier, PMB and Vanco remain antibacterial "active", and are far less toxic because they remain bound to the HydroDEX™ molecule. The advantages of the HydroDEX™ method (much greater drug dose and far less toxicity) outweigh any others on the market.

25. nDS was introduced to ILSE by Silver. In 2014, Yeoman consulted with Silver extensively concerning HydroDEX™. During the course of these confidential consultations, nDS provided trade secrets and other confidential data and information to Silver, including the entire nDS NSF SBIR Phase I proposal application and Proof of Concept data. Yeoman carefully marked the emails sent to Silver "CONFIDENTIAL AND PROPRIETARY". Silver wanted to use nDS's HydroDEX™ targeting drug delivery nanogel [(weak PMB dose/sub Minimum Inhibitory Effect "MIC")] that would dock (bond/attach) to the LPS A component of the GNB "membrane" and create antibacterial susceptibility by punching a hole in the bacteria (permeabilizing the outer membrane), so that a second drug or inhibitor released from the HydroDEX™ matrix could attack the bacterial site of LPS production (LpxC site for enzymatic inhibition via zinc nanoparticle or zinc chemical compound). Utilizing Hydr oDEX™, nDS and Silver, together with

microbiologist, Karen J. Shaw ("Shaw"),[6] created a safe and successful method for targeting the GNB LPS site (the "Yeoman-Silver-Shaw Method"), and disrupting LPS. The Yeoman-Silver-Shaw Method was an innovative "dual", two-punch, drug delivery method.

26. The Yeoman-Silver-Shaw Method was proprietary. Silver asked Yeoman for permission to publish the Method. Yeoman refused.

27. In early 2016, Yeoman contacted Bostian, and met with him in New Jersey. Yeoman explained to Bostian that nDS had a DHS/SBIR grant and needed BSL II laboratory work performed and a microbiology director. On January 5, 2016, Yeoman sent Bostian a copy of a "CONFIDENTIAL" PowerPoint presentation, together with a "consulting agreement which is tied to the nanoDERM Sciences, Inc. (nDS) DoD 5 year contract and provides for immediate potential contribution and compensation for qualified employees, consultants, and partners. This agreement enables the confidential release of all company documents including the Proof of Concept data and reports." Yeoman notified Bostian that nDS's "most pressing need is to recruit a qualified Principle Investigator and senior microbiologist for our existing DoD contract award and the planned federal R&D proposal/award program." ILSE/Bostian referred nDS to El-Sherbeini.

[6] Both Silver and Shaw signed non-disclosure and non-circumvention agreements with nDS. Silver and Shaw agreed, *inter alia*, that all proprietary information supplied by nDS was confidential; that the confidential information "is very valuable to nDS, and the use and disclosure of which must be carefully and continuously controlled"; that "[a]ll ideas, discoveries and inventions" discovered by Silver in the course of the engagement "shall be and remain the exclusive property" of nDS; and that "she will not disclose or permit anyone else to disclose such Proprietary Information without prior written consent of **nDS**. Additionally, **Silver** agrees that she will not use or permit any other party to use the Proprietary Information without prior written consent of **nDS** " (Bold in original).

28. On January 9, 2016, nDS and El-Sherbeini signed a confidential Consulting Agreement (the "El-Sherbeini Contract"). Paragraph 3 of the El-Sherbeini Contract states:

> 3. **Ownership of Work Product.** Consultant hereby assigns, grants and conveys to Client all right, title and interest in and to any document, development, work product, know-how, design, processes, invention, technique, trade secret, or idea, and all intellectual property rights related thereto, that is created by Consultant and which relates to Consultant's services provided pursuant to this Agreement (the "***Work Product***"),

Paragraph 7 of the El-Sherbeini Contract states:

> 7. **Confidential Information.** In the discussions between the parties, Consultant acknowledges that he will be provided Confidential Information owned by **nDS** which is or may be protected by copyright, patent and trade secret laws, which is very valuable to **nDS**, and the use and disclosure of which must be carefully and continuously controlled. Consultant agrees that **nDS** shall remain the sole owner of the Confidential Information (as defined below) including all patents and copyrights thereof, and upon termination of negotiations or any resulting relationship between the parties, whether or not an agreement is reached between the parties, Consultant shall return to **nDS** all Confidential Information. It is hereby further understood and agreed that any intellectual property derived from Confidential Information of the Client is owned by the Client. Consultant agrees to hold Client's Confidential Information in strict confidence and not to disclose such Confidential Information to any third parties. Consultant also agrees not to use any of Client's Confidential Information for any purpose other than performance of Consultant's services hereunder. "***Confidential Information***" as used in this Agreement shall mean all Work Product and all other information disclosed by Client to Consultant or otherwise regarding Client or its business obtained by Consultant pursuant to services provided under this Agreement that is not generally known in the Client's trade or industry. Confidential Information also includes proprietary or confidential information of any third party who may disclose such information to Client or Consultant in the course of Client's business. All Confidential Information shall be kept confidential by Consultant, and he will not disclose or permit anyone else to disclose such Confidential Information. Consultant agrees that he will not use or permit any other party to use the Confidential Information without prior written consent of **nDS**. Consultant agrees to use his best efforts to prevent any of its Directors, officers, employees, affiliates or agents, if any, from making any disclosure or use of the Confidential Information which is inconsistent with the terms of this Agreement. To that end, Consultant agrees to maintain the Confidential Information in a safe place, providing access to it only to those parties who need access to the Confidential Information. Consultant further agrees that he will obtain from all individuals employed by him who have access to the Confidential Information a written non-disclosure agreement which includes terms substantially similar to the terms of this Section. Consultant agrees to notify **nDS** immediately of the unauthorized possession, use or disclosure of Confidential Information, and to furnish to **nDS** full details of such unauthorized possession, use, or disclosure.
>
> Consultant's obligations set forth in this Section shall not apply with respect to any portion of the Confidential Information that Consultant can document by competent proof that such portion: (i) is in the public domain through no fault of Consultant; (ii) has been rightfully independently communicated to Consultant free of any obligation of confidence; or (iii) was developed by Consultant independently of and without reference to the Work Product or any information communicated to Consultant by Client. In addition, Consultant may disclose Client's Confidential Information in response to a valid order by a court or other governmental body, and as otherwise required by law. All Confidential Information is the sole and exclusive property of Client or its suppliers or customers. Upon request by Client, Consultant agrees to promptly deliver to Client the original and any copies of such Confidential Information.

Section 8.2 of the El-Sherbeini Contract provides:

> **8.2 Effect of Termination.** Upon any termination of this Agreement, Consultant (i) shall immediately discontinue all use of Client's Confidential Information delivered under this Agreement; (ii) shall delete any such Client Confidential Information from Consultant's computer storage or any other media, including, but not limited to, online and off-line libraries; and (iii) shall return to Client, or, at Client's option, destroy, all copies of such Confidential Information then in Consultant's possession. In the event the Client terminates this Agreement, the Client will make a final payment to the Consultant based on the proportion of services completed by Consultant through the date of notice of such termination, and Consultant will not receive any additional consulting fees or other compensation as of the date of notice of termination.

29. Pursuant to and in reliance upon the terms of the El-Sherbeini Contract, nDS provided El-Sherbeini with nDS's proprietary and confidential data, information and documents relating to HydroDEX™, including, but not limited to, the following:[7]

- "CONFIDENTIAL January 26, 2016 email, including identification of the LpxC target site and attachments "Targeted site LPS", "Targeting Gram Positive" and "Nelson results [microbiology report and Proof of Concept]";
- Confidential emails regarding HydroDEX™ conjugation means and methods;
- Nelson microbiology report and Proof of Concept data;
- nDS 15.1 DoD SBIR proposal, Army topic DHP 15-007, entitled *Small Molecule to Combat Multi-Dru Resistant Bacteria*;
- nDS 15.1 DoD SBIR contract award, Army topic DHP 15-007, entitled: *Small Molecule to Combat Multi-Dru Resistant Bacteria*;
- May 1, 2015 MIPS proposal, entitled *Nanogels and Multi-Resistant Drug Bacteria*;
- July 16, 2015 MIPS award contract, entitled *Nanogels and Multi-Resistant Drug Bacteria*; and

[7] All data, documents and information was delivered to El-Sherbeini and marked "confidential". None of the data, documents, information, proprietary methods and procedures provided to El-Sherbeini was in the public domain of otherwise available to the public. All information was subject to efforts by nDS to maintain the strictest confidentiality.

- nDS commercialization plan and Phase II submittal for Sepsis.

("nDS Trade Secrets").

30. El-Sherbeini recognized the enormous scientific and financial benefits to be obtained by nDS and its nanotechnology. El-Sherbeini acknowledged to Yeoman that the Targeting Therapeutic Nanoparticles field "has a tremendous potential. nDS seems to be on the rise and it must be an exciting time for you." El-Sherbeini emailed Yeoman a link to a BBC article that discussed the need for "new antibiotics" to deal with MRB. The article noted, *inter alia*, that "there has not been a new class of antibiotic brought to market, against Gram negative bacteria, for more than four decades." Based upon his review of the nDS Trade Secrets, El-Sherbeini knew that HydroDEX™ filled the pharmaceutical industry gap. On January 25, 2016, El-Sherbeini emailed Yeoman to say that the field of MRB was a "great research area to be in and you already have a head start and it is exciting."

31. In February 2016, nDS and ILSE entered into a master service agreement ("MSA") for *in vitro* testing of HydroDEX™ at ILSE's lab in New Jersey. Under the MSA, the work would be conducted in 2 phases, with the purpose of meeting the NSI DHP SBIR Phase I deliverable #1, demonstrating that the study rationale led to 2-3 analogues with increased activity. Phase I was directed toward antibacterial testing of initial HydroDEX™ conjugate investigational products. Phase II would expand on the initial Phase I testing, with additional test substance, other antibiotics and testing assays, each to be determined based on the results of Phase I.

32. The MSA stated as follows:

> "ILSE LABS acknowledges that its relationship with NSI [nDS] is one of high trust and confidence and that in the course of its Service to NSI it will have access to and contact with Confidential Information. ILSE LABS agrees that it will not, during the term or at any time thereafter, disclose to others, or use for its benefit, the benefit of others, or for any purposes other than as may be necessary to provide Services to under this Agreement, any Confidential Information (as defined below) or invention, except that ILSE LABS may disclose Confidential Information to ILSE LABS's officers, employees and agents, but only if the persons to whom the Confidential Information is disclosed have a reasonable need to know in connection with providing Services to NSI and only if they shall have agreed in writing to the same level of confidentiality obligations set forth in this Agreement."

For purposes of the MSA, "Confidential Information" meant:

> "all information (whether or not patentable and whether or not copyrightable) owned, possessed or used by NSI or generated by ILSE LABS under this Agreement, including, without limitation, intellectual property, data and other material relating directly or indirectly to NSI's business, projects or products, marketing or sales information, financial, business or strategic information, clinical or manufacturing information, and regulatory information, which may include, but is not limited to, technical data, trade secrets, know-how, intellectual property or other materials owned or controlled by NSI, including, but not limited to, research, product plans, products, samples, specifications, service plans, services, customer lists, customers, markets, software, developments, inventions, processes, formulas, chemical applications, laboratory instruments, laboratory methods of analysis, interpretation of lab results, techniques, technology, manufacturing methods, designs, drawings, engineering, marketing, distribution and sales methods and systems, sales and profit figures, finances and other business information; and all other information, data and other material that is communicated to, learned of, developed or otherwise acquired by ILSE LABS in the course of its Service as a consultant to the NSI."

"Confidential Information" included the nDS Trade Secrets delivered to Silver in early January 2016[8] and subsequently El-Sherbeini, Bostian and ILSE.

33. Yeoman introduced El-Sherbeini to Xu. On Monday, February 21, 2016, El-Sherbeini obtained samples of the HydroDEX™ nanogels and other materials from Li

---

[8] In early January 2016, Yeoman emailed Silver the specific results of nanoparticle testing on MRB performed by Dr. Daniel Nelson for nDS, a "**Report for NanoDERM SBTR grant proposal on MTC testing of Samples 1-8** " prepared by Monique L. van Hoek, Associate Professor, George Mason University, and the protocol for how HydroDEX™ worked.

at Xu's Lab. On February 26, 2016, El-Sherbeini notified nDS that "[w]e (John Pace[9] & I) will be working on the MIC assay this weekend. I have the Pmxn Conjugates that I obtained from Xin [Li] on Monday. I could stop by NJIT Saturday morning to pick up additional materials."

34. Beginning in March 2016, ILSE evaluated the HydroDEX™ samples pursuant to the MSA. On March 2, 2016, El-Sherbeini reported to Yeoman and Xu that preliminary disk diffusion assays "showed that the Conjugated Pmn and vanco behaved as expected". On March 10, 2016, El-Sherbeini forwarded a draft of a "great report" of the testing. Subsequent evaluations by ILSE later in March and again in April, including susceptibility tests, returned very positive results. On April 28, 2016, El-Sherbeini emailed Yeoman and Xu as follows:

> From: Xu, Xiaoyang <xiaoyang.xu@njit.edu>
> To: Mohamed El-Sherbeini <msherbeini@gmail.com>
> Cc: Roy Yeoman <royryeoman@aol.com>; Duane Hospenthal <drhospenthal@gmail.com>
> Sent: Thu, Apr 28, 2016 7:07 pm
> Subject: Re: Susceptibility Data
>
> Fantastic! We may continue the susceptibility experiment till three weeks or four weeks.
> Xiaoyang
>
> On Thursday, April 28, 2016, Mohamed El-Sherbeini <msherbeini@gmail.com> wrote:
>
> > All,
> > Susceptibility tests were repeated yesterday using samples stored at 4 C for 2 weeks. Test strains included representatives of A. baumanii, K. pneumoniae, E. coli and S. aureus.
> > The results show full activity. Zones of inhibition obtained today were comparable with those obtained 14 days ago. As far as I can tell, physical appearance looks the same to me, like 2 weeks ago.
> > Your feedback?
> > Mohamed

---

9 John L. Pace ("Pace") is a biotech/pharmaceutical industry scientist employed by ILSE. At all times relevant to this action, Pace was subject to the terms and conditions of a non-disclosure agreement between nDS and ILSE that expressly preserved the confidentiality of the nDS Trade Secrets.

Xu thought the results were "Fantastic!". Based upon the results, El-Sherbeini reported to Bostian that HydroDEX™ was "80 times more efficient" than any other nanotechnology at targeting and combating MRB.

35. On April 2, 2016, Bostian/ILSE published a support letter for nDS' NIH SBIR PAR-14-088 ("Direct Phase II SBIR Grants to Support Biomedical Technology Development") proposal, entitled "*Targeted Nanogels for Treatment of Multidrug-Resistant Bacteremia and Sepsis*", Pl, Yeoman, Co-PI Duane R. Hospenthal PhD, MD. The letter, signed by Bostian, unequivocally stated as follows:

> Dear Mr. Yeoman and Dr. Hospenthal:
>
> Thank you for making me aware of your company's intention to apply to the NIH SBIR Direct Phase II program. The therapeutic nanomedicine you are developing to treat multidrug-resistant infections is admirable. It is understood that, if awarded the NIH SBIR Direct Phase II grant, microbiology R&D evaluations of the nDS Direct Phase II antibacterial therapeutic nanogels will be conducted at the Institute for Life Science Entrepreneurship (ILSE) under the direction of Mohamed El-Sherbeini PhD, the nDS Director of Microbiology R&D. The term of this potential antibacterial microbiology study will be from September 2016 to August, 2018.

36. nDS and ILSE created a poster that acknowledged the parties' collaboration, summarized the results of the evaluation undertaken at the ILSE Lab, and, importantly, reiterated that all the work was based on nDS Trade Secrets. Yeoman guarded the secrecy of nDS's Trade Secrets. He refused to allow El-Sherbeini/Bostian to disclose the targeting prodrugs in the poster. They were printed in the blind as "Comparator."

> nanoDERM Sciences, Inc.
>
> **Activity of Targeted HydroDEX™ Against Multidrug-Resistant Bacteria *In Vitro***
>
> Roy Yeoman III[1], Duane R. Hospenthal[1], and Mohamed El-Sherbeini[2]
>
> [1]nanoDERM Sciences, Inc.; [2]ILSE Labs
>
> ILSE
> INSTITUTE FOR LIFE SCIENCE ENTREPRENEURSHIP

The nDS/ILSE evaluation corroborated the efficacy of HydroDEX™ in targeting MRB:

> **CONCLUSIONS**
>
> We developed two novel antimicrobial nanogel formulations, HydroDEX™- # 1 and HydroDEX™-# 2. The *in vitro* antibacterial activities of the two HydroDEX™ formulations were assessed against clinical isolates of the ESKAP pathogens.
>
> HydroDEX™- # 1 inhibited growth of multidrug resistant GNB including *A. baumannii*, *P. aeruginosa*. *E. coli* and *Klebsiella pneumonia*.
>
> HydroDEX™- # 2 inhibited growth of multidrug resistant GPB including *S. aureus* (MRSA), *E. faecium* and *E. faecalis*.

The poster was intended to start the ball rolling for raising capital and attracting commercialization partners pursuant to nDS's confidential commercialization plan that was shared with Bostian, TLSE, El-Sherbeini and Silver. As Silver stated in a subsequent meeting in Bostian's office with El-Sherbeini present, "**I can market this!**", "**The mechanism of antibacterial activity of polymyxin is poorly understood**", "**A paper on this would be read round the world.**"

37. nDS's NIH SBIR Phase II proposal submitted on April 5, 2016 was discussed and scored, but fell short of funding. The SBTR Program Director for the National Tnstitute of Allergy and Tnfectious Diseases ("NIAID"), Dr. Tongqing Zhou, debriefed Yeoman and said that nDS's proposal needed to explain the principles of nanomedicine for those reviewers not fam iliar with the HydroDEX™ drug delivery system. His major suggestion was to add a discussion of nDS's approach and explain the advantages of nDS's patented "Targeted Controlled Drug Delivery" system, which is a therapeutic approach desired and published by the NTATD. Tn the fall of 2016, nDS decided to resubmit its application.

38. Yeoman also pursued other funding opportunities. He met with the Biomedical Advanced Research and Development Authority ("BARDA"), Combating Antibiotic Resistant Bacteria Biopharmaceu tical Accelerator ("CARB-X") board in Washington, D.C. at BARDA industry day. Yeoman was encouraged to submit an expression of interest application for funding. nDS submitted an application, entitled "**Targeted Antibacterial Nanogels to Combat Multidrug Resistant Bacteria**" (seeking a grant of $3.5 million/3 years), and the application was accepted into the 2017 CARB-X cycle 2b $3.3 Million R&D grant competition.

39. At Yeoman's request, ILSE provided letters of support for nDS's NIH SBIR Phase TT resubmittal. On January 4, 2017, Pace signed a letter that stated:

> I am pleased to write this letter of support for the nanoDERM Sciences, Inc. (nDS) NIH Direct Phase II SBIR grant application by Roy R. Yeoman III and Duanne Hospenthal, PhD, MD entitled ***"Targeted Nanogels for Treatment of Multidrug Resistant Bacteremia and Sepsis".***
>
> I have worked on the nDS 15.1 Defense Health Program SBIR Phase I Contract Award to "Develop a Small Molecule to Combat Multidrug-Resistant Bacteria" which was successful and accepted by DoD SBIR management. I have been involved with nDS on this project for about one year, advising on clinical microbiology studies of various nDS nanogels being conducted at ILSE Labs, work that has reported on and jointly presented with nDS at a scientific conference in 2016. These experiments provided clear evidence of the *in vitro* activity of early nanogel formulations broadly against Multidrug Resistant Gram-positive and Gram-negative pathogens, and I very much support the further development of this technology.

40. Although TLSE provided letters of support for nDS's NIH SBIR Phase II resubmittal, TLSE, Bostian, Silver and El-Sherbeini concealed from nDS that they had leaked nDS Trade Secrets, including the GNB LpxC site for enzymatic inhabitation (the Yeoman-Silver-Shaw Method) and other confidential and proprietary data, to others and had copied nDS's DHP SBIR Phase II proposal, its SBTR "Direct" Phase TT proposal, and its CARB-X proposal. Based upon nDS's confidential January 5, 2017 NTATD Direct Phase II submission, "**Targeted Nanogels for Treatment of Multi-Drug Resistant Bacteremia and Sepsi**s" (seeking funding of $2.79 million/3 years), including nDS's

commercialization plan, and nDS's February 2017 CARB-X EOI application "**Targeted Antibacterial Nanogels to Combat Multidrug Resistant Bacteria**", Bostian focused on "sepsis" as a therapeutic indication.[10]

41. On June 16, 2017, nDS was forced to withdraw from the CARB-X grant competition because nDS could not identify/secure a "matching fund" investor.

42. Bostian and Silver disclosed nDS Trade Secrets to Prokaryotics, and, thereby, secured "matching fund" investors to win the CARB-X $3.3 Million grant.

43. On January 25, 2018, Prokaryotics announced that it had entered into a licensing agreement with Merck to "develop, manufacture and commercialize a collection of early pre-clinical programs and compounds with potential application as novel antibiotics targeting Gram-negative and Gram-positive bacterial cell envelope enzymes". [http://prokaryotics.com/news/licensing-merck-novel-amr/]. Upon information and belief, Prokaryotics obtained this lucrative contract as a direct result of the disclosure of nDS Trade Secrets by Bostian and Silver.

44. nDS later discovered that Bostian and Silver also took nDS Trade Secrets, including those disclosed to them by El-Sherbeini, to Merck & Company to "renew" and "enhance" the many drugs in Merck's portfolio. Silver's successful pitch to Merck (based upon nDS's trade secrets, the DOD DHP SBIR Phase I funded data provided in confidence to El-Sherbeini, and the Yeoman-Silver-Shaw Method of proof of mechanism/validation)

---

[10] At Least 1.7MM adults develop sepsis in the United States each year. MRSA (Gram Positive Bacteria) and Gram Negative Bacteria cause 80 to 85% of the sepsis cases in the U.S. The unmet need for sepsis therapy costs over $10 billion in the U.S. alone. Bostian was well-aware of the enormous commercial market for nDS's technology.

generated major seed funding for ILSE/Bostian seed companies and secured a "Drug Class" renewal deal for Merck.

45. In February 2020, nDS learned that Silver used nDS's confidential data, methods and techniques to design glycol-peptide antibacterial drug experiments that were conducted by ILSE.

46. The El-Sherbeini/ILSE/Bostian/S ilver "leap-frog" scheme was very successful. With Merck behind it, ILSE leaped ahead of nDS in the research and development of nanoparticle drug therapy. Merck's infectious disease drugs were "renewed" with the nDS method of targeted drug delivery (60-80 times more potent/far less toxic) to avoid falling off the patent cliff with new patent protection.

**2. *Xu, Wang, Li, Sun, Tsou, NJTT and Zhang***

47. On January 25, 2016, nDS hired Xu as its chief consultant under the DHP/SBIR contract. Based upon conversations with Yeoman and information confidentially provided by Yeoman, Xu became aware that nDS's patent portfolio was expanding. The original "hydrogels and polymers" application and "targeting therapeutic nanoparticles" application claimed the cr eation of nanoparticles formed from the polysaccharide class cross-linked to the poloxamers class. Xu knew that nDS intended to produce a complete library of nanogels based upon its original platforms. Indeed, Xu knew that nDS intended to create a library of polysaccharide-polyester-PEG nanoparticles. [11] Yeoman and Xu agreed to develop a library of nDS HydroDEX™ nanogels (including

[11] The polyester-PEG nanoparticles can be injected into the body cavity via syringe for *in situ* self-polymerization (60 seconds) offering unique surgical advantages for unmet needs.

varied ratios of the two FDA approved monomers that formed the patented co-polymer HydroDEX™) and form a company in China (largest health care market) to address China's pandemic E coli outbreak and the world-wide problem of MRB. Xu immediately understood and acknowledged the scientific and financial opportunities presented by HydroDEX™. [12] Xu signed a letter of commitment and letter of intent memorializing his agreement to work with nDS. nDS and Xu signed a confidential Consulting Agreement (the "Xu Contract") that was identical in form to the El-Sherbeini Contract. In February and March 2016, nDS and Xu signed additional consulting agreements pursuant to which Xu agreed to review nDS's HydroDEX™ formulations, methods of synthesis, materials, laboratory production process, and quality control procedures, and provide HydroDEX™ nanocarrier drug load and drug release formulations that included methods, materials, laboratory production process, and quality control procedures.

48. Pursuant to and in reliance upon the terms of the Xu Contract and the follow-on consulting agreements, nDS provi ded Xu with nDS's proprietary and confidential data, information and documents relating to HydroDEX™, including, but not limited to, the following:

- Method of Preparation of HYDRODEX™ NANOGELS – the original procedure that produced nanoparticles that were stable for 5 days (January 26, 2016 Email);

- Chemistry protocol procedures for conjugating PMB) onto the Dextran component of the nDS HydroDEX™ nanogels;

---

12 For instance, on March 4, 2016, Xu confirmed the following in a letter of commitment delivered to nDS:

> Thank you for making me aware of your company's nanotechnology. The nanotechnology that nanoDERM is developing may very well win the battle against multidrug-resistant infections. This new nanomedicinal approach will have very high impact upon successful completion. I am excited about participating on this worthwhile project.

- Chemistry protocol procedures for conjugating Vanco onto the Dextran component of the nDS HydroDEX™ nanogels;
- Data – development of Dextran based copolymer with PMB to target the membrane of GNB and Vanco to target the cell wall of GPB;
- Data – when conjugated to the HydroDEX™ copolymer, PMB and VCM are non-toxic and any potential systemic side effects of PMB and VCM are negligible;
- HydroDEX™-PMB inhibited growth of Gram negative (E. coli, P. aeruginosa, and K. pneumoniae) multidrug resistant bacteria and to a lesser extent Gram positive (S. aureus) organisms and HydroDEX™-VCM inhibited growth of Gram positive (S. aureus) multidrug resistant bacteria;
- HydroDEX™ holds "search-and-destroy" functionality to combat harmful pathogens;
- HydroDEX™ nanogels have been synthesized and preliminary characterization has been performed – Initial nanogels, produced by inverse mini-emulsion, were shown to have a diameter of -100 nm by dynamic light scattering and confirmed by transmission electron microscopy;
- *fn vitro* toxicity data – nDS contract performed hemolysis assays (DHP SBIR required) on HydroDEX™-PMB (HydroDEX™ #1), HydroDEX™-VCM (HydroDEX™ #2), and dextran solution;
- Nelson Evaluation Data: HydroDEX™-PMB nanogels inhibited growth of drug resistant gram negative bacteria;
- Nelson Evaluation Data: HydroDEX™-VCM tested in lab showed strong inhibitory effects on methicillin-resistant S. aureus, and on gram positive bacteria (E. faecium and E. faecalis) tested;
- HydroDEX™ "Gram Positive" targeted Antibacterial nanogels with "active" Vanco antibacterial warhead that produced antibacterial activity against MDR GPB;
- *Proof of Concept* data that antibacterial therapy to combat both GNB and GPB MDR pathogens;
- Original CONFIDENTIAL June 2014 NSF SBIR Phase I proposal;

- nDS DOD, DHP 15.1 (topic 15-007 ) SBIR Phase I grant proposal submitted Feb. 25th, 2015 entitled: *Targeted Therapeutic Nanogels for Effective Treatment of Multidrug-Resistant Bacteria in Wounds*; PI: Roy R. Yeoman III. Co-PI: Col. US Army (Ret.) Duane R. Hospenthal PhD, MD, FACP, FIDSA, FASTMH. Phase I Amount: $149,838. Performance term: September 27th, 2015 to March 27th, 2016;

- DHS/SBIR contract awarded to nDS;

- Proprietary Inverse Mini-Emulsion Polymerization and Production protocol for synthesizing HydroDEX™;

- nDS, Inc. Confidential Presentations to Qualified Investors, including Disclosure of SRI International as the nDS designated Preclinical and Clinical partner, and other confidential nDS PowerPoint presentations relating to its patented hydrogel drug delivery system;

- Confidential disclosure of nDS's consultants, advisors, collaborators, subcontractors, and select contract research organizations ("CROs'), contract development organizations ("CDOs"), contract manufacturing organizations ("CMOs"), and regulatory partners; and

- Trade secret specialty chemicals, drugs, reagents, etc. essential to produce the HydroDEX™ products (paid for by nDS and shipped to Xu's laboratory at NJIT).

(the "nDS Trade Secrets").[13]

49. On multiple occasions, Xu acknowledged receipt of the nDS Trade Secrets.

50. In addition to a $150,000.00 subcontract award opportunity, Xu was paid a total of $15,000 for services to be delivered under the Xu Contract and consulting agreements. On February 10, 2016 nDS delivered PMB, Vanco and Clindamycin to Xu for conjugation to the HydroDEX™ nanoparticles. Yeoman advised Xu that "[w]e have included Clindamycin for a drug load/release exposure against bacteria." On February 15,

[13] As with El-Sherbeini, all data, documents and information was delivered to Xu and marked "CONFIDENTIAL". None of the data, documents, information, proprietary methods and procedures provided to Xu was in the public domain of otherwise available to the public. All information was subject to efforts by nDS to maintain the strictest confidentiality.

2016, Xu emailed Yeoman and El-Sherbeini to report more "exciting news" relating to the nDS nanogels:

> From: Xu, Xiaoyang <xiaoyang.xu@njit.edu>
> To: Roy Yeoman <royryeoman@aol.com>; Mohamed El-Sherbeini <msherbeini@gmail.com>
> Sent: Mon, Feb 15, 2016 3:36 pm
> Subject: Nanogel results
>
> Dear Roy and Mohamed,
> I am attaching the most recent results for drug conjugated Nanogels with around 100% bacterial inhibition at 24h time point (see attachment). The results are exciting! We are currently working on the stability study. Considering we have been working on the project for only two weeks, I won't expect long stability data at this moment. I am happy to discuss the results and research plan tomorrow.
>
> Mohamed- Drug conjugated nanoparticle will be available tomorrow morning and you are welcome to pick samples up at your convenient time. Please notify me one day in advance so that I can arrange pickup accordingly.
>
> Best,
> Xiaoyang

Xu attached to his email "the most recent results for drug conjugated Nanogels with around 100% bacterial inhibition at 24h time point (see attachment). The results are exciting!" Xu's work-product as chief consultant for nDS showed the following:

## Antibacterial Test by $OD_{600}$

| | Antibacterial Efficiency | |
|---|---|---|
| Samples | 5 h | 24 h |
| 1st Nanogel | 77.71±5.42% | 99.19±0.07% |
| 2nd Nanogel | 96.99±0.00% | 99.59±0.14% |




NJIT New Jersey Institute of Technology 2

El-Sherbeini congratulated Xu: "the data looks great !!!" Yeoman also congratulated Xu, and emphasized to Xu that all of Xu's work-product was confidential. In a "CONFIDENTIAL" email, Yeoman stated, "Professor Xu, Great. That is very good news. **Please keep in mind that this nDS DHP research is entirely CONFIDENTIAL** " (Emphasis added).

51. On April 4, 2016, Xu forwarded a letter of support for nDS' Phase II proposal from Zhang. The letter of support confirmed Zhang's agreement to join the "nDS team" in its project. Zhang expressly affirmed the following:

> Date: April 3, 2016
>
> Re: Letter of Support for **"Targeted Nanogels for Treatment of Multidrug-Resistant Bacteremia and Sepsis"** PD/PI, Roy R. Yeoman III, Co PI, Duane R. Hospenthal BS, MS, PhD, MD, FACP, FIDSA, FASTMH.
>
> Dear Mr. Yeoman & Dr. Hospenthal,
>
> Thank you for contacting me regarding your intention to submit a proposal application for the NIH SBIR Opportunity Number PAR-14-088 entitled "Direct Phase II SBIR Grants to Support Biomedical Technology Development." I am very excited to join the nDS team as Chief Technology Officer and Director of Laboratories, should this award be granted. This project is of particular scientific importance in the battle against drug resistant pathogens.
>
> The aim of this nDS three year project is to develop and test a safe, effective, biodegradable, and inexpensive nontherapeutic platform for bacteremia, Multidrug-Resistant bacteremia and sepsis. Upon notification of award I will establish the chemistry laboratory and produce the HydroDEX™ based targeting antibacterial nanogels under GLP protocol. I understand that the term of the award and my employment will be Sept. 1, 2016 through August 31, 2019. I further understand that I will be compensated at the rate of $ 90,000 per year for a 100 percent 12 month effort.

52. In accordance with the Xu Contract and consulting agreements, Xu agreed to provide nDS with improved formulations and methods of production of the HydroDEX™ nanogels. Xu further agreed to devise and document drug load/release formulations for HydroDEX™, and to provide nanocarrier drug load and release formulations that included methods, materials, laboratory production process, and quality

control procedures. Although Xu was paid a $5,000 to perform the services related to drug load/release formulations, by September 2016, he had not provided the deliverables.

53. On September 1, 2016, Yeoman met with Xu at Xu's NJIT office. During the meeting, Xu informed Yeoman for the first time that he (Xu) had prepared or caused to be prepared a provisional patent application which, Xu stated, had been filed with the United States Patent and Trademark Office ("USPTO"). Prior to the meeting, Xu had not disclosed any inventions stemming from his work for nDS. Xu indicated that he had filed the provision patent application and had assigned or was in the process of assigning the application to NJTT. While pointing to a PowerPoint presentation, Xu went on to explain a reference in the patent application to utilizing dextran conjugated PMB and dextran conjugated vancomycin modalities – the exact two modalities that were expressly disclosed to Xu by nDS as part of the nDS Trade Secrets. Yeoman requested a copy of the provisional patent application, but Xu refused to provide it. Xu claimed that "the submitted provisional application is not related nDS Technology. T am happy to go over the application with you in person but unfortunately T can't send a copy to you."

54. On September 13, 2016, Yeoman met again with Xu at Xu's office. At this meeting, Xu told Yeoman that he had filed the provisional patent application in August 2016. Xu insisted that the provisional patent application was unrelated to nDS's technology. Xu confirmed to Yeoman that he had disclosed nDS Trade Secrets to Zhang.

55. On October 18, 2016, nDS, by counsel, put Xu on notice that he was in breach of the Xu Contract by reason of his unauthorized use and misappropriation of nDS Trade Secrets, misrepresentation of "Inventor" status in the patent application, unauthorized assignment of invention/patent application to NJTT, unauthorized disclosure

of nDS Trade Secrets to third-parties, and failure to perform and deliver work product to nDS under the Xu Contract. nDS demanded that Xu produce a copy of the provisional patent application to nDS, assign the provisional application to nDS, and take steps to identify Yeoman as a co-Inventor. nDS also demanded to see copies of Xu's laboratory notes and work product as chief consultant under the Xu Contract, and the immediate return of the nDS Trade Secrets and the nDS specialty chemicals and drugs that were provided to Xu. nDS demanded to know what intellectual property Xu had developed, in whole or any part, using nDS's Trade Secrets. nDS also demanded that Xu divulge all disclosures to Zhang or anyone else at Harvard, MIT or any other third parties. nDS's letter concluded as follows:

> It is most unfortunate that your actions to date have materially harmed nDS and deprived it not only of the full measure of the bargain that it struck with you in January 2016, but also deprived it of the property interests that it has carefully sought to preserve in its Confidential Information and in the Work Product resulting from your work under or in connection with the Agreement. After receipt of the above demanded information and documentation, nDS *may* be willing to discuss with you a path forward that could give rise to a mutually satisfactory resolution and continued collaboration. With that olive branch in hand, however, nDS nonetheless reserves all rights, claims, defenses and remedies, and nothing contained in this letter is intended or should be construed as a waiver of any such rights, claims, defenses or remedies. Furthermore, no actions or inactions on the part of nDS since its association with you has been intended or should be construed as a ratification or acquiescence of your conduct or a waiver of its rights and remedies.

56. nDS never received the provisional patent application Xu claimed to have filed and was not otherwise able to confirm Xu's representations. Unbeknownst to nDS, Xu took the nDS Trade Secrets generated by nDS from its DHD/SBIR grant and worked with Zhang and others at Harvard between August 2016 and September 2017 to quickly generate animal studies. Xu then took the results to universities in China.

57. In early 2017, NSF Innovation Corps awarded NJIT a $50,000 research grant for a project entitled, "**Nanomedicine as Treatment for Drug-Resistant Bacteria**"

(NSF Award # 1723667). The PI on this project was Xu. The start date was March 1, 2017 and the estimated end date was November 30, 2018. Xu concealed the fact that he had applied for and received this grant. This NJIT I-Corps project is based upon nDS Trade Secrets disclosed to Xu under the Xu Contract and consulting agreements and work performed by Xu for nDS. The NJIT drug delivery system is based upon the nDS award winning proposal submitted to DHP SBIR, entitled: "***Targeted Therapeutic Nanogels for Effective Treatment of Multidrug-Resistant Bacteria in Wounds***," PI Roy R. Yeoman III. The Award abstract states:

> "The broader impact/commercial potential of this I-Corps project is to treat an enormous healthcare danger, infections caused by drug resistance bacteria. The serious threat of drug resistant bacteria, including E. coli, MRSA and K. pneumonia, jeopardizes the health and wellbeing on a global population. Achievement of this development as well as commercializing the product will provide an effective way of delivering therapeutics to multidrug resistant bacteria infections, improving the life quality of patients worldwide. Global healthcare will be greatly improved, benefiting society and saving lives of many patients who currently suffer from drug resistant bacteria.
>
> This I-Corps project will produce an effective antibacterial drug delivery platform to combat multidrug resistant bacterial infections. Although numerous antimicrobial drugs have been developed with therapeutic efficacy, inefficient delivery is a significant issue due to the antibiotic resistance. An innovative nanomedicine approach is created to encapsulate current antimicrobial drugs in targeted nanoparticles to efficiently delivery drugs and combat the antibiotic resistance. This advanced technology will not only improve healthcare, but also enhance scientific and technological understanding of nanoparticle drug delivery systems in treating antibiotic resistance bacterial infections. This drug delivery system has great potential to advance knowledge as it may be altered to treat many other illnesses if successful."

[https://www.nsf.gov/awardsearch/showAward?AWD_ID=1723667&HistoricalAwards=false).

58. On September 30, 2017, Xu, Wang, Li, Sun, Tsou and Chen published the following paper in the Macromolecular Bioscience Journal:

FULL PAPER
Antibacterial Hydrogel
Macromolecular Bioscience
www.mbs-journal.de

**Dual-Functional Dextran-PEG Hydrogel as an Antimicrobial Biomedical Material**

*Lei Wang, Xin Li, Tianyu Sun, Yung-Hao Tsou, Hong Chen, and Xiaoyang Xu**

(the "Xu Article").

59. The Xu Article unequivocally identifies confidential nDS Trade Secrets that Xu – and only Xu – had received from nDS:

## 4. Conclusions

A novel antibacterial dextran-PEG hydrogel was successfully synthesized by the crosslinking of MA-dextran with PMB and Vanco conjugated PEG, exhibiting the proper gel strength and swelling ratio for wound dressing application. The dual-functional hydrogel proved effective against both gram-negative bacteria *E. coli* and gram-positive bacteria *S. aureus* and demonstrated exceptional antibacterial activity. More importantly, systemic side effects of these antibiotics can be effectively avoided due to chemical immobilization within the hydrogel, preventing their further release from the gel network. Moreover, by penetrating bacteria cell membrane, the hydrogel samples were able to kill bacteria without presenting cytotoxic effects to mouse fibroblast cell line NIH 3T3. The PMB and Vanco chemical immobilization strategy developed in this work coupled with the biocompatibility of the hydrogel provides an attractive and promising alternative in the field of wound dressing that will successfully accelerate healing, while simultaneously prevent secondary infections.

60. Although nDS developed its HydroDEX™ nanogel technology over a period of many years, the Defendants recognized the enormous scientific and commercial value of nDS's product and swooped in and took the technology in an instant.

61. Publication of the Xu Article alerted nDS to the fact that Xu, NJIT, Wang, Li, Sun, Tsou and Chen had misappropriated the nDS Trade Secrets.

62. Publication of the Xu Article, however, was only the first in a series of thefts of nDS's Trade Secrets by the Defendants.

63. In September 2017, Xu, Tsou, Zhang and others published a paper in the Advanced Science News, entitled "**Nanotechnology-Mediated Drug Delivery for the Treatment of Obesity and Its Related Comorbidities**" In this paper, Xu, Tsou and Zhang disclosed nDS Trade Secrets, including data and information relating to polymer nanoparticles.

64. On October 16, 2017, Xu, Tsou, Zhang and others published a paper, entitled "**Drug Delivery to the Brain across the Blood–Brain Barrier Using Nanomaterials**" [https //onlinelibrary.wiley.com/doi/abs/10.1002/smll.201701921]. In this paper, Xu, Tsou and Zhang disclosed nDS Trade Secrets, including data, information, means, methods and drug delivery strategies obtained as a direct result of Xu's work for nDS. NJIT received funding from the New Jersey Health Foundation ("NJHF") and NSF I-Corps for this project.

65. In March 2018, nDS learned that NJIT had, in fact, filed a provisional patent application (US 2018/0071409 A1) (the "NJIT Patent Application"). The NJIT Patent Application lists Xu and Tsou as the inventors of a "biodegradable and intrinsically photoluminescent hydrogel". The NJIT Patent Application discloses nDS Trade Secrets, including, but not limited to, Dextran-NIR (1) experimental data and fluorescent comparison of a Dextran-NIR, and misappropriates a beneficial interest in nDS's intellectual property illegally obtained by Xu and Tsou in breach of the Xu Contract and

Xu's fiduciary duties to nDS. The USPTO accepted the patent application in April 2020, but a patent has not yet been issued.

66. In May 2018, Xu, Zhang and others published a paper, entitled "**Bioactive hydrogels for bone regeneration**" In this paper, Xu and Zhang disclosed nDS Trade Secrets, including data and information relating to nDS's emulsion polymerization method.

67. Xu's academic Red Star rose immediately after he disclosed misappropriated nDS antibacterial technology. In December 2018, Xu published yet another paper, entitled "**Exploring cutting-edge hydrogel technologies and their biomedical applications**" Xu again disclosed nDS Trade Secrets, including the biomedical applications of hydrogel technologies.

68. On October 11, 2019, Xu and Zhang co-authored a cardiac antibacterial paper, entitled "**Injectable Citrate-Based Hydrogel as an Angiogenic Biomaterial Improves Cardiac Repair after Myocardial Infarction**" [https://pubmed.ncbi.nlm.nih.gov/31573790/]. Xu and Zhang again disclosed nDS Trade Secrets, and borrowed directly from nDS's means, methods and data. The publication of this article fostered collaboration with the Department of Cardiovascular Surgery, Ruijin Hospital, Shanghai, Jiaotong University School of Medicine, Shanghai, PRC, and led to financial support from the American Heart Association (Grant No. 19AIREA34380849 (X.X.), and startup funding for NJIT from the NJHF (PC102-17 and PC25-18), the NSF I-Corps program (1723667)., and the National Natural Science Foundation of China (Grants 81671832 and 81571826) and the Interdisciplinary Program of Shanghai Jiao Tong University (Project Number ZH2018ZDA36 (19X190020006)). In addition, between December 2019 and March 2020, Xu received NSF grant support, an NCE Rising Star

Research Award, and the Technology Innovation Translation Acceleration (TITA) Seed Grant award. [http://centers.njit.edu/nhblab/news-1/]. All of these awards and grants are ill-gotten gains of NJIT, Xu and Zhang's misappropriation of nDS Trade Secrets and data derived from work performed by Xu for nDS on the DOD DHP SBIR Phase I contract.

69. In 2020, Xu, Zhang and others published a paper in the Journal of Controlled Release, entitled "**Biodegradable nanoparticles decorated with different carbohydrates for efficient macrophage-targeted gene therapy**" In this paper, Xu and Zhang disclosed nDS Trade Secrets, including data and information directly related to nDS's nanoparticles and targeted drug delivery system.

70. Between 2017 and 2020, Xu and Zhang have orchestrated and combined with Chinese born assistant professors, life science scientists and students at many different universities both in the United States and in the PRC to produce research that is supportive of the many papers written by Xu and Zhang. In this process, Xu and Zhang have disclose nDS Trade Secrets that Xu obtained exclusively as a result of the work he Xu for nDS under the Xu Contract.

71. Xu has received the "1000 Plan Professorship for Young Talent" from the Peoples Republic of China as a result of his unlawful disclosure and use of the nDS Trade Secrets. The 1000 Talent Plan professorship is the highest academic honor awarded by the State Council. [*See* http://njit.technologypublisher.com/technology/27099].

72. Xu and Zhang have delivered the nDS Trade Secrets to China. In addition to making 90% of the antibiotics in the World, the PRC now has the nDS countermeasure to biological warfare! Xu and Zhang efforts to steal nDS's research and technology are

part of the most severe counterintelligence threat facing US today. Xu and Zhang's playbook is simple: — rob, replicate and replace. [https://www.washingtonpost.com/world/national-security/top-fbi-official-warns-of-strategic-threat-from-china-through-economic-and-other-forms-of-espionage/2018/12/12/38067ee2-fe36-11e8-83c0-b06139e540e5_story.html].

73. Xu and Zhang were named consultants on a DOD DHP/SBIR Phase II proposal and two "Direct" Phase II proposals, which Bostian and ILSE eventually won based upon the misappropriated nDS Trade Secrets. Like Xu, Bostian went to China with the "news" of successful antibacterial activity against all of the CDC's priority MRB. El-Sherbeini, who was, at all times, nDS's paid ILSE contract consultant and director of microbiology on the nDS DOD DHP/SBIR Phase I contract (and Bostian's best friend as it turns out) provided the confidential data to Bostian. It was only because of nDS Trade Secrets given to him by El-Sherbeini that Bostian was able to win contracts from DoD and gain additional business opportunities for himself, ILSE and Prokaryotics.

**COUNT I – <u>DEFEND TRADE SECRETS ACT VIOLATIONS</u>**
**(Title 18 U.S.C. § 1836)**

74. nDS restates the allegations in paragraphs 1-73 above, and incorporates them herein by reference.

75. nDS states a claim against all Defendants under Title 18 U.S.C. § 1836(b) for multiple misappropriations of the nDS Trade Secrets between 2016 and the present – specifically, the methods of preparation of the HydroDEX™ nanogels and the procedures for conjugating PMB and Vanco onto the dextran component of the HydroDEX™ nanogels.

76. As inventor and patent holder, nDS holds rightful legal or equitable title to the nDS Trade Secrets, and, therefore, is owner of the nDS Trade Secrets. The nDS Trade Secrets constitute a form and type of scientific, technical, economic, or engineering information, including compilations, formulas, designs, prototypes, methods, techniques, processes, and procedures, tangible, or intangible, that nDS has taken reasonable measuresto keep such secret and confidential. The nDS Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. The NDS Trade Secrets are related to products or services used in, or intended for use in, interstate or foreign commerce.

77. The Defendants acquired the nDS Trade Secrets with actual and express knowledge or constructive knowledge that the Trade Secrets were acquired by improper means, including breach of the Xu Contract and El-Sherbeini's fiduciary duties as nDS's Director of Microbiology, and theft of nDS's intellectual property. The Defendants disclosed and used the nDS's Trade Secrets without express or implied consent of nDS or Yeoman. At the time of disclosure and use by the Defendants, they knew or had reason to know that their knowledge of the nDS Trade Secrets was derived from or through persons, Xu and El-Sherbeini, who had used improper means to acquire the Trade Secrets and that Xu and El-Sherbeini acquired the Trade Secrets under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets or limit the use of the Trade Secrets. At all times relevant to this action, the Defendants knew that Xu and El-Sherbeini acquired nDS's Trade Secrets unlawfully and that Xu and El-Sherbeini who owed a duty to nDS to maintain the secrecy of the Trade Secrets and to limit the use of the Trade Secrets. Additional

necessary information relating to Defendants' misappropriation is largely in the hands of the Defendants and their agents, not nDS.

78. As a direct and proximate result of the Defendants' misappropriation of the nDS Trade Secrets, nDS suffered substantial damage and incurred actual loss, including, but not limited to, loss and injury to its business and good will, lost profits, damage to its name and reputation, loss of revenue received by the Defendants as a result of their unjust enrichment, loss of royalties as a result of the Defendants' unauthorized disclosure or use of the nDS Trade Secrets, attorney's fees, and other special damages and out-of-pocket expenses in an amount to be determined by the evidence, but not less than $150,000,000.00.

79. Because the Defendants willfully and maliciously misappropriated the nDS Trade Secrets, nDS seeks an award of exemplary damages in an amount not more than 2 times the amount of the damages awarded.

80. In addition to money damages, nDS requests an injunction pursuant to Title 18 U.S.C. § 1836(b)(3) to prevent any further actual or threatened misappropriation of the nDS Trade Secrets and payment of a reasonable royalty on all existing violations of § 1836(b) to the extent that nDS does not have an adequate remedy at law.

**COUNT II – NEW JERSEY TRADE SECRETS ACT VIOLATIONS**
**(N.J. Stat. § 56:15-1 *et seq*)**

81. nDS restates the allegations in paragraphs 1-80 above, and incorporates them herein by reference.

82. nDS states a claim against all Defendants under the New Jersey Trade Secrets Act, N.J. Stat. § 56:15-1 *et seq*, for multiple misappropriations of the nDS Trade Secrets between 2016 and the present – specifically the methods of preparation of the

HydroDEX™ nanogels and the procedures for conjugating PMB and Vanco onto the dextran component of the HydroDEX™ nanogels.

83. nDS is the owner of a trade secret, consisting of information with independent economic value that nDS has taken reasonable measures to keep secret.

84. The Defendants misappropriated nDS's Trade Secrets on multiple occasions. They knowingly and improperly acquired and used or disclosed the nDS Trade Secrets.

85. The Defendants' conduct violates the New Jersey Trade Secrets Act.

86. As a direct and proximate result of the Defendants' violations of the New Jersey Trade Secrets Act, nDS suffered substantial damage and incurred loss, including, but not limited to, loss and injury to its business and good will, lost profits, damage to its name and reputation, loss of revenue received by the Defendants as a result of their unjust enrichment, loss of royalties as a result of the Defendants' unauthorized disclosure or use of the nDS Trade Secrets, attorney's fees, and other special damages and out-of-pocket expenses in an amount to be determined by the evidence, but not less than $150,000,000.00.

**COUNT III – CONVERSION**

87. nDS restates the allegations in paragraphs 1-86 above, and incorporates them herein by reference.

88. At all times relevant to this action, nDS had a clear, definite, undisputed and obvious property right in its personal property, data, records and information, to which nDS was entitled to immediate possession.

89. In 2017 and 2018, the Defendants wrongfully exercised and assumed authority over nDS's tangible personal property, depriving nDS of possession. The

Defendants wrongfully exerted dominion over property in which nDS has an interest in denial of and inconsistent with nDS's rights and interests. The Defendants interfered with nDS's property rights in a way that is inconsistent with the full exercise of those rights. The Defendants effectively prevented nDS's exercise of intangible rights of the kind customarily merged in a document.

90. The Defendants' actions constitute the tort of conversion.

91. The Defendants knowingly and willfully converted nDS's property, and have acted under circumstances amounting to a willful and wanton disregard of nDS's rights and interests.

92. As a direct and proximate result of the Defendants' conversion, nDS suffered substantial damage and incurred loss, including, but not limited to, loss and injury to its business and good will, lost profits, damage to its name and reputation, attorney's fees, and other special damages and out-of-pocket expenses in an amount to be determined by the evidence, but not less than $150,000,000.00.

**COUNT IV – <u>CONSPIRACY</u>**

93. nDS restates the allegations in paragraphs 1-92 above, and incorporates them herein by reference.

94. Beginning in 2017 and continuing through the present, the Defendants combined, associated, agreed or acted in concert together and with agents and employees of NJIT, Harvard, MIT and Soochow University, PRC, for the express purposes of injuring nDS, converting its property and interfering with its contracts and business. In furtherance of the conspiracy, the Defendants engaged in a joint scheme the steal nDS' Trade Secrets and use and disclose nDS's Trade Secrets and profit therefrom. At all times during the

course of the conspiracy, Xu and El-Sherbeini acted illegally, fraudulently and outside the scope of their employment for nDS and for ILSE and NJIT.

95. The Defendants acted intentionally, purposefully, without lawful justification, and with the express knowledge their actions were injuring nDS.

96. The Defendants' actions constitute a conspiracy in violation of New Jersey law or other applicable laws prohibiting conspiracies to injure another in trade, business, profession or reputation.

97. As a direct and proximate result of the Defendants' conspiracy, nDS suffered substantial damage and incurred loss, including, but not limited to, loss and injury to its business and good will, lost profits, damage to its name and reputation, attorney's fees, and other special damages and out-of-pocket expenses in an amount to be determined by the evidence, but not less than $150,000,000.00.

**COUNT V – TORTIOUS INTERFERENCE**

98. nDS restates the allegations in paragraphs 1-97 above, and incorporates them herein by reference.

99. nDS had a valid contract with DOD DHS/SBIR and reasonable business expectancies in and under the contract. nDS also had reasonable business expectancies in the work product created by Xu and El Sherbeini, including the provisional patent application allegedly filed by Xu, and, thus, the follow-on projects undertaken using nDS's work product, and the economic advantages to be obtained from these projects.

100. The Defendants knew that nDS had the contract. They were provided a copy by nDS. The Defendants also knew about nDS' reasonable business expectancies by reason of their execution and performance of the consulting agreements and non-disclosure

agreements.

101. The Defendants intentionally interfered with nDS's contract, property rights and business expectancies by, *inter alia*, misappropriating nDS's Trade Secrets and converting its property, and by using nDS's property to submit follow-on proposals to DOD. The Defendants acted out of their own self-interest and to enrich themselves at the expense of nDS. The Defendants actions and practices were, *inter alia*, independently unlawful, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.

102. As a direct and proximate result of the Defendants' tortious interference with contract, nDS suffered substantial damage and incurred loss, including, but not limited to, loss and injury to its business and good will, lost profits, damage to its name and reputation, attorney's fees, and other special damages and out-of-pocket expenses in an amount to be determined by the evidence, but not less than $150,000,000.00.

**COUNT VI – BREACH OF FIDUCIARY DUTY**

103. nDS restates the allegations in paragraphs 1-102 above, and incorporates them herein by reference.

104. By reason of their contracts and positions and by taking possession of and retaining dominion and control over nDS's confidential information and personal property, the Defendants owed nDS a fiduciary duty to act in utmost good faith and with due regard for the rights and interests of nDS. The Defendants further owed nDS a duty of full disclosure, a duty to avoid self-dealing, a duty to protect nDS's property for nDS's benefit, and a duty to disclose anything which might have affected nDS's decision whether and how to act regarding its property.

105. The Defendants breached their common law fiduciary duties by devising a scheme to steal and convert nDS's property, by disclosing and using nDS's property without permission and for their sole personal benefit, by failing to disclose material facts to nDS, and by fraudulently transferring nDS's property to themselves and third parties.

106. As a direct result of Defendants' breaches of fiduciary duty, nDS suffered substantial damage and incurred loss, including, but not limited to, loss and injury to its business and good will, lost profits, damage to its name and reputation, attorney's fees, and other special damages and out-of-pocket expenses in an amount to be determined by the evidence, but not less than $150,000,000.00.

**COUNT VII – BREACH OF CONTRACT**

107. nDS restates the allegations in paragraphs 1-106 above, and incorporates them herein by reference.

108. Xu and El-Sherbeini's actions, described above, constitute a material breach and repudiation of their contracts with nDS.

109. As a direct result of Defendants' breaches of contract, nDS suffered substantial damage and incurred loss, including, but not limited to, loss and injury to its business and good will, lost profits, damage to its name and reputation, attorney's fees, and other special damages and out-of-pocket expenses in an amount to be determined by the evidence, but not less than $150,000,000.00.

**COUNT VIII – UNJUST ENRICHMENT**

110. nDS restates the allegations in paragraphs 1-109 above, and incorporates them herein by reference.

111. nDS had a reasonable expectation to be paid for the use of its Trade Secrets

and technology.

112. The Defendants used nDS's technology and benefitted from such use.

113. Under the circumstances, it would be unreasonable and unjust for the Defendants to retain the benefit of nDS's intellectual property without paying for the use of same.

114. A reasonable royalty for the use of nDS's property is $150,000,000.00.

115. As a direct result of Defendants' unjust enrichment, nDS seeks damages against Defendants in the sum of $150,000,000.00 or such grater amount as is determined by the Jury.

nDS alleges the foregoing based upon its knowledge, public statements of others, and records in its possession. nDS believes that substantial additional evidentiary support, which is in the exclusive possession of the Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

nDS reserves the right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

For the reasons stated above and to be shown by the evidence, nDS respectfully requests the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A. Compensatory damages in the amount of $150,000,000.00;

B. Double damages in the sum of $300,000,000.00;

C. Punitive damages in the amount of $5,000,000.00 per Defendant or the maximum amount allowed by law;

D. Disgorgement of the unjust and ill-gotten gains;

E. A reasonable royalty as a result of the unauthorized disclosure and use of nDS's Trade Secrets;

F. Injunctive relief as prayed for above;

G. Prejudgment interest on the Principal Sum awarded by the Jury from September 30, 2017 to the date of Judgment;

H. Post judgment interest;

I. Reasonable Attorney's Fees and Costs;

J. Such other relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED: January 25th, 2022

Signature of Counsel
Roy R. Yeoman III PRO SE

s/s/ Roy R. Yeoman III PRO SE